270 P.2d 1002

## CLAUNCH v. JONES et al.

### No. 8067.

Supreme Court of Idaho.

May 18, 1954.

272

Donald R. Good, Blackfoot, for respondent.

PORTER, Chief Justice.

In June, 1949, respondent came into the town of Arco from Salmon City seeking a business opportunity. He contacted appellant, a real estate dealer. An oral agreement was entered into between the parties whereby appellants agreed to sell to respondent four lots in Arco for the price of $4,000. It was the purpose of respondent to construct a motel thereon. No money was paid down. Respondent represented that he had sold his farm near Salmon City on contract and would receive about $15,000 as proceeds from the sale. Permission was granted respondent to start the construction of the motel on such lots.

In August, respondent borrowed $1,500 from appellants, agreeing to pay the same back within thirty days. Such repayment was not made. Later, respondent made application to the First Security Bank of Ida-

Albaugh, Bloem, Barnard & Smith, Idaho Falls, for appellants.

ho, Pocatello Branch, for a loan of $5,000 in order to obtain funds to repay the $1,500 and to complete the construction of the motel. As a condition for the loan, the bank required that appellants transfer an undivided one-half interest in the lots to respondent. This was done; and the parties, together with their wives, signed the note and mortgage on the property dated October 4, 1949, for $5,000. The obligation was made payable May 1, 1950, upon the representation by respondent that he would have money at that date from the proceeds of the sale of his farm.

When the note and mortgage fell due respondent did not pay the same. He had not fully completed the construction of the motel. He had sizable outstanding accounts for labor and material. The bank requested the payment of the obligation. Appellant Jones was told by respondent that he could not pay the note and mortgage.

On June 5, 1950, R. S. Tysom, Vice President of the First Security Bank in Idaho Falls, with a Mr. Wasley, assistant manager of such bank, at the request of the Pocatello Bank, came to Arco to get a settlement on the note and mortgage. Mr. Tysom had a meeting with Jones and Claunch. He advised them the bank would not renew the loan to both parties, but that if the property were deeded to appellants the bank would renew the $5,000 loan. At a subsequent meeting the same day, a quitclaim deed was signed and delivered by respondent and wife to appellants. The quitclaim deed recited a consideration of one dollar and other valuable consideration.

By his amended and supplemental complaint, respondent alleged that at the time of the execution of the quitclaim deed there were outstanding obligations for labor, materials and supplies used in the construction of the motel as follows: To Montgomery Ward & Co., the sum of $1,831.25; which indebtedness respondent has since compromised and paid by disbursement of the sum of $1,200. To Merrill Brothers for gravel and building materials in the sum of $85; which amount is due, owing and unpaid. To Salmon Electric in the sum of $571.09; which said amount is due, owing and unpaid. To the Federal Housing Administration for the reasonable value of the furnace in the sum of $832.63; which sum is due and unpaid. To the Boise-Payette Lumber Co., in the sum of $2,466.78; which indebtedness has been compromised and settled by appellants.

It was further alleged in said amended and supplemental complaint that appellants agreed to assume, pay and discharge said items of indebtedness as part of the consideration for the quitclaim deed, but have failed, neglected and refused so to do. Respondent prayed judgment for the total of the indebtedness paid by him and the unpaid obligations in the sum of $2,688.64; and for $300 attorney's fees.

By their answer, appellants denied that as part of the consideration for such quitclaim deed or otherwise, they agreed to as-

sume and pay any indebtedness save and except the $5,000 mortgage. They alleged a lien for the Boise-Payette Lumber Co., obligation was filed against the property and appellants were thereby compelled to settle such obligation. Upon the issues thus made trial was had to the court sitting without a jury. The court made findings of fact and conclusions of law favorable to respondent and entered judgment against appellants for the total of the items of indebtedness, both paid and unpaid by respondent, together with $300 attorney's fees; and made the whole thereof a lien upon the property in question. From such judgment this appeal has been taken.

Appellants contend upon this appeal that the evidence is insufficient to sustain the court's finding and judgment that appellants, as a part of the consideration for the quitclaim deed, agreed to assume, pay and discharge any obligations of respondent for labor and materials used in the construction of the motel or incurred in connection therewith, save and except the $5,000 mortgage. Appellants recognize the well-established rule that this court will not disturb the findings of the trial court where there is any competent and substantial evidence to sustain them although the evidence may be meager and conflicting.

Appellants rely upon the also well-established rule that the appellate court is not bound by the findings of the trial court and the judgment based thereon, where they are not sustained by substantial evidence. Harding v. Home Investment, etc., Co., 49 Idaho 64, 286 P. 920, 297 P. 1101; Clark v. Clark, 58 Idaho 37, 69 P.2d 980; Bussell v. Barry, 61 Idaho 216, 102 P.2d 276.

Let us examine the evidence as to what was said and occurred between the parties with reference to the consideration for the quitclaim deed. Respondent testified as to what was said at the meeting between Mr. Jones, Mr. Tysom, Mr. Wasley and respondent on June 5, 1950, as follows:

"Q. Will you tell The Court generally as best you can recall what this conversation was between the four of you? A. Well, Mr. Tysom told me that Mr. Severn from the First Security Bank in Pocatello had asked him to bring the note to a conclusion, and the one Mr. Jones had at the First Security Bank in Pocatello—

"Q. That is this five thousand dollar note? A. The five thousand dollar note—And he asked me if I had the money to pay it, and which I didn't, and asked if I would assign my interest in the Motel to Mr. Jones and they could give Mr. Jones an extension of the note, but they couldn't give us both one.

"Q. Did he give any reason for his inability—inability of the bank to make an extension? A. No they didn't.

"Q. Now, what was the rest of the conversation that you can recall? A.

Well, I told them I would be willing to assign my interest to Mr. Jones along with the outstanding accounts.

"Q. What do you mean, assign your interest together with the outstanding accounts, explain that? A. Well, I would do it if he would assume the accounts which was against the Motel.

"Q. Now—Your understanding was reached with respect to that proposition? A. It was my understanding, yes.

"Q. Well, what was the understanding?" (To this question an objection was sustained.)

Respondent testified that later in the day a Mr. Boyatt, Mr. Tysom and Mr. and Mrs. Jones came to the house where respondent was working; and that they brought a quitclaim deed. He further testified:

"Q. And what—Can you recall the conversation that took place then? That's up to the house there before you signed the deed? A. Well, they brought the deed up and asked if I would sign it and I wouldn't do it, and I discussed the accounts and I asked Mr. Boyatt for legal advice on the thing and he said he couldn't give me any because he was representing Mr. Jones.

"Q. Well, did you sign the deed at that time? A. Yes, we discussed the accounts to the point—and I asked Mr. Tysom who would be responsible for the accounts against the Motel, and he said he thought legally in his mind Mr. Jones would be. We discussed the accounts for quite some time before I signed the deed."

He further testified that Mr. and Mrs. Jones came down to the motel where respondent and wife were living later that evening and wanted to know what the outstanding accounts were against the motel.

He also testified that four or five days later, he stopped in at the office of Mr. Jones with reference to the outstanding accounts and the following conversation took place:

"Q. Will you relate the conversation that took place between Mr. Jones and yourself at that time? What did you say, and what did he say? A. Well, I told Mr. Jones some of these people were riding me on these accounts, and asked him what he was going to do, and Mr. Jones said he wouldn't say he wasn't going to pay them but was going to beat them down all he could."

Mrs. Ethel Novotney, the wife of respondent at the time the quitclaim deed was executed, testified concerning the occasion of the signing of the deed as follows:

"A. Well, it seems the first that was said was Mr. Boyatt, said that he had the quit claim deed made up and wanted to know if we would sign it, and then I think that Wesley asked Mr. Jones at

that time that their agreement—for him to finish paying the outstanding debts, that that was to stand to, and then he asked Mr. Boyatt if he could give him any advice on it and he said no he couldn't because he was working for Mr. Jones, and he asked Mr. Tysom, he said—

"Q. Who asked Mr. Tysom? A. Wesley—could you tell me if Mr. Jones will assume or should assume all of these outstanding debts if I sign the quit claim deed and give him my share, and Mr. Tysom said that he couldn't—he didn't know legally, that he was no authority, but in his own mind he thought that's the way it would have to be."

She further testified that Mr. and Mrs. Jones called at the Claunch apartment later that evening and inquired about the outstanding bills.

Mr. R. S. Tysom, testifying concerning the meeting with Jones and Claunch at the office of Mr. Jones, stated as follows:

"So I told him, upon instructions from our Pocatello bank, that if Mr. Jones had title to the property that we were willing to continue the loan through, renew or extend it through Mr. Jones, and Mr. Claunch said he couldn't pay it and he thought that that would be alright, and Mr. Jones at that time, I know, told Mr. Claunch that—Or Mr. Claunch, I think as I

remember there he was anticipating the possible sale of the property, and Mr. Jones assured him at that time that if he could sell the property within a reasonable length of time, that all he, Jones, was interested in was getting his money, and that it was agreed then that the quit-claim deed would be signed by Mr. Claunch, and as I remember, Mr. Claunch requested that we have Mr. Boyatt prepare the deed, and I think substantially that is what transpired there."

Concerning the meeting with Mr. and Mrs. Claunch, where the quitclaim deed was signed, the witness testified:

"A. Well, Mr. Claunch asked me what was going to happen with the bills, just mentioned as bills, nothing further, no details as to amount or to whom he might have owed, and I informed him—I didn't know what would take place, the final conclusion, as I remember—of course that was a matter that he and Mr. Jones would have to settle between themselves, the bank wasn't—what we were interested in was getting the note in shape, we weren't concerned with the unpaid bills.

"Q. Did you at any time make any statement to the effect that Mr. Jones would be legally liable for these bills? A. I did not, because I am not in position to make such a statement."

Under cross-examination, he further testified:

"Q. Well, I am not speaking of the bank loan, I am speaking of the debts. That was discussed in your presence there at that house, was it not? A. As I have testified—

"Q. And what was said by whom? Do you remember the conversation? A. Claunch, as I remember, asked me what would happen to the bills, and I told him that I wasn't in position to tell him what would happen to them.

"Q. Alright, was Mr. Jones present, and was Mr. Boyatt present? A. Mr. Jones and Mr. Boyatt were both present.

"Q. And no one offered any explanation as to about—the manner in which or by whom these items of indebtedness were to be paid? A. No sir."

The witness, C. V. Boyatt, was the lawyer and notary who prepared the quitclaim deed, had the same signed and acknowledged the signatures thereon. He could not "remember anybody making any statement at the time concerning payment of any bills or otherwise", at the time the quitclaim deed was signed.

Appellant, O. T. Jones, in his testimony, denied he ever at any time agreed to assume and pay the outstanding bills as part of the consideration for the quitclaim deed.

A careful examination of the foregoing testimony of respondent and his former wife discloses that they did not testify to any statement by Mr. Jones that he would assume and pay the outstanding bills. Their testimony further shows that immediately prior to the execution of the quitclaim deed they were inquiring as to whether Mr. Jones would be *legally liable* for the bills. Nowhere in the evidence is there any showing that appellants expressly agreed to assume and pay the outstanding accounts.

The memorandum decision of the trial judge is before us. We are at liberty to consider the theory upon which the trial court based its decision. Terry v. Terry, 70 Idaho 161, 213 P.2d 906. The memorandum decision discloses that the trial court, under the relationship of the parties as shown by the evidence, considered that the burden of proving the consideration for the quitclaim deed was upon appellants. The trial court was in error in this respect as the burden of proof was clearly upon the respondent to prove the allegations of his complaint which were, among others, that appellants, as part of the consideration for the quitclaim deed, assumed and agreed to pay the outstanding indebtedness.

Apparently recognizing there was no express agreement by appellants to assume the outstanding obligations, the trial court proceeded on the theory that there was an implied agreement shown by the evidence. It is to be remembered it was not the appellants who initiated the matter of the quit-

claim deed but it was the creditor bank. Further, the evidence does not disclose that respondent, prior to the execution of such quitclaim deed, ever discussed with appellants, or that appellants knew, what obligations were outstanding and to whom payable and the amounts thereof.

The trial court, to sustain its theory of implied agreement, assumed that the giving of the quitclaim deed resulted in a loss to respondent and an unjust gain to appellants. The witness, Richard Severn testified that he was Vice President of the First Security Bank of Idaho, Pocatello Branch; and that prior to making the $5,000 loan to the parties herein, he appraised the property at $12,000, including the lots and the motel in a completed condition. Deducting from such valuation, $4,000 for the lots and $5,000 for the mortgage leaves an equity of $3,000. The evidence shows it cost appellants $3,400 to complete the motel after they obtained a quitclaim deed. In addition, appellants were compelled to pay $2,200 to satisfy the lien of the Boise-Payette Lumber Co. In order for appellants to be made whole the property would have to be worth roughly $15,000. It is true respondent testified that the property was worth $20,000. However, he authorized its sale at $14,000. Appellants tried to sell the motel prior to its completion for $14,000 and also for $10,000 but were unable to do so.

At the time the quitclaim deed was given by respondent, the construction of the motel had not been completed. Respondent had no funds with which to complete it. The completed part had been poorly constructed. Respondent was engaged on another building project. He had the hereinbefore described outstanding debts. He and his wife were living in the motel and receiving the rentals from the completed part. He was advised that if the property could be sold within a reasonable time for enough to give Mr. Jones the $4,000 purchase price of his lots, respondent could have any additional funds from the sale. This apparently was the only possible chance for him to get anything out of the property. A foreclosure by the bank would have completely cut off his equity, and, incidentally, would have left the bills for him to pay. Under all the facts, the equities of the parties do not sustain an inference of an implied agreement on the part of appellants to assume and pay the outstanding accounts.

The evidence in this case both direct and circumstantial is not sufficient to sustain the court's finding that appellants agreed either directly or impliedly to assume, pay and discharge the obligations in question as part of the consideration for the quitclaim deed.

Appellants also contend that in any event, the judgment could not be sustained for the amount of obligations which have not been paid by respondent; that no attorney's fees could be allowed; and that personal judgment should not have been entered against Mrs. Jones. In view of our holding that the evidence will not sustain any judgment in

favor of respondent, it is unnecessary to discuss these additional assignments of error.

The judgment of the trial court is reversed. Costs awarded to appellants.

GIVENS, TAYLOR, THOMAS and KEETON, JJ., concur.