287 P.2d 981

Johanna M. CRAMER and A. J. Cramer, her husband, Plaintiffs-Appellants,

v.

E. W. DRIESBACH and Martha Driesbach, his wife, et al., Defendants-Respondents.

No. 8104.

Supreme Court of Idaho.

Sept. 14, 1955.

Hawkins & Miller, McNaughton & Sanderson, Coeur d'Alene, for appellants.

Whitla & Knudson, Coeur d'Alene, Bandelin, Bandelin & Ponack, Sandpoint, for respondents.

TAYLOR, Chief Justice.

This appeal concerns boundary disputes between the parties. The defendants (respondents) were originally the owners of all of the lands involved, which lie in Section 21, Township 56 North, Range 1 West, Boise Meridian, Bonner County. Sometime about 1923 they caused a survey to be made by one, Ashley, for the purpose of de-

scribing the boundaries of certain portions of the land which they at that time conveyed to one, Bush, and also to determine the boundaries of that portion of the land retained by them. By mesne conveyances, plaintiffs (appellants) became the owners in 1935 of the land conveyed to Bush.

Some of the lands are bounded on the east by Garfield Bay, an inlet of Pend Oreille Lake. According to the description in the Bush conveyance, all of the land retained by defendants, except what is known as tract B., lies south of the east-west center line of the section. Tract B., lying north of such center line, is contiguous thereto, the center line being the south boundary thereof.

In 1941, one, Tiggelbeck, a surveyor employed by defendants, made a plat of a subdivision known as Garfield Bay Add. No. 1. This subdivision covered land along the lake front in government lots Nos. 2 and 3. Tiggelbeck testified that he did not make a subdivision survey of the section, but started from monuments on the south line and ran north to monuments pointed out to him by defendant Driesbach, as marking the east-west center line of the section. He did not check to see if these monuments correctly located the center line. He found the distance from the south section line to the center line, as indicated by Driesbach, to be 2,700 feet, and testified he questioned

the correctness of the center line and warned Driesbach it was too far north and that the indicated location was doubtful. Driesbach replied that the indicated points "were supposed to be correct and he was to use them." Accordingly the plat of Garfield Bay Add. No. 1 locates all of the property in that subdivision south of the center line. Driesbach denies that Tiggelbeck questioned the center line location.

In 1946, one, Wilson, in the employ of the defendants, made a plat of Garfield Bay Add. No. 2, purporting to cover land, belonging to defendants, also lying south of the east-west center line of the section and between Garfield Bay Add. No. 1 on the east and a portion of plaintiffs' property on the west.

In June, 1951, O. A. Modlin, a cadastral engineer, licensed to survey in Montana and Idaho, made a subdivision survey of section 21. He rechecked his survey again on the ground in June, 1953. Attached is a plat of section 21; also a plat covering the two areas in dispute, made by Modlin. One of the disputed areas is a portion of lot 1 in Garfield Bay Add. No. 1. The other is a strip covering the westerly portions of tract A and lots 1 to 14 in Garfield Bay Add. No. 2. Modlin started his survey at Homestead Entry Survey No. 514, Corner No. 4, and went west and found the

78

south quarter corner in place, set in the ground, with bearing tree and markings according to the original notes. He then ran west a half mile and found the southwest section corner in place and marked as described in field notes. He then went back to the south quarter corner and ran north through the center of the section and located the north quarter corner, with bearing trees or stumps corresponding with the field notes. He then went to the northeast corner where he at that time did not locate the government corner, but accepted a corner fixed by previous surveyor. In his 1953 recheck he moved this corner to the intersection of two old section line fences, 31.7 feet north of the point originally accepted by him in 1951, having satisfied himself that the fence intersection was located on the true corner. Tiggelbeck had surveyed section 15 in 1931. He testified that at that time he found the northeast corner of section 21 in place, under the fence at the point accepted by Modlin in his 1953 recheck. From there Modlin went to the northwest section corner, where he found the original stone monument in place, marked in accordance with the field notes, and a stump of one of the witness trees in proper course and distance. He then ran south to the southwest corner. Not finding the west quarter corner, he came back and established it on the line midway between the southwest and northwest corners. This was all in accord with the Manual of Surveying Instructions 1947 of the Department of Interior, §§ 360–364. Section 205 of the manual provides: "If such quarter corners are lost they should be re-established by proportionate measurement based upon the original record." The original field notes give a total of 80 chains for the west section line, 40 chains on each side of the quarter corner. Modlin found the total to be 80.94 chains and fixed the corner to provide 40.47 chains in each half.

There being no east quarter corner, its position being out in the lake, he took the mean course of the north section line, and the mean course of the south section line, and using the mean of these two as his course, he ran the center line from the west quarter corner east to the government meander line on the lake, in accord with manual section 206. Where this line intersected the north-south center line, he set the center quarter corner, manual § 205.

The description in plaintiff's deed includes all of the land in the northeast quarter of the section, lying west of the irregular line, through that quarter section as shown on the plat, except tract B. It also includes the west half of the southwest quarter of the section and the west 28 rods of lots 2 and 3.

Modlin surveyed the irregular line through the northeast quarter of the section, following the courses and distances given by Ashley. He found that the call for "S. 36° 30' E., 7.45 chains to the meander line of Pend Oreille Lake" ends at a

point some distance east of the meander line. The next call in the description is, "thence southerly along said meander line to the east and west center line of section 21". Taking the course of the meander line from the point arrived at on the last previous call, Modlin went south to the east-west center line, which he intersected at a point 88.4 feet east of the meander line. As testified by Modlin, the fact that Ashley did not give any distance "along said meander line to the east and west center line" tends to indicate that he did not know where the center line was. Ashley was not a witness, and no map or notes by him are in evidence. It must be concluded he did not correctly locate the center line if, indeed, he located it at all. Then, following the Ashley description, Modlin went 3.30 chains west to the southeast corner of tract B. and on around that tract. In so doing he found all of the buildings on that tract within the boundaries as fixed by him. He noted that one of the buildings, a residence, was not within tract B. as purported to have been bounded by the Wilson survey.

In locating the east line of plaintiffs' property in the southeast quarter of section 21, Modlin located the south one-sixteenth corner 19.65 chains east of the south quarter corner, and the one-sixteenth corner on the east-west center line, 19.62 chains east of the center of the section. From these points he measured seven chains or 28 rods east on the south line, and on the center line and there fixed the southeast and northeast corners of plaintiffs' property in that quarter section. The east line of the property connecting these corners was run on a course north 1° 50′ west. Asked why he used that course, his answer was that that was the proper direction from one corner to the opposite, corresponding corner. The course of the center line from south to north is north 1° 47′ west. If the witness had followed that course on the east line of plaintiffs' property, the north end of that line would fall a little to the east of where the engineer located it. The course of the center line being definitely established by the location of the original north and south quarter corners, if a departure from that course and the use of a different course in running the east line of plaintiffs' property was error, it was an error which favored defendants. Likewise, if there were any error in the location of the two one-sixteenth corners, the error favors the defendants. The east half of the north section line is shown to be 40.54 chains, which would be some indication that the distance from the south quarter corner and the center of the section to the one-sixteenth corners should be twenty chains or more; whereas the witness fixed the distance at less than 20 chains.

On behalf of defendants, Joe C. Vernon, county surveyor of Boundary County, and a surveyor of long experience, made a partial survey of section 21, between the 17th and 20th of May, 1951. He started from

two points, supposedly on the east-west center line, which were pointed out to him by the defendant Driesbach. One of these points was the southwest corner of tract B. After taking polaris readings he went west to the west line of the section where he said he found the original quarter corner. In going west he adopted a correction of polaris at elongation of about one minute west. May 17, 1951, Gurley's Ephemeris for the Azimuth of Polaris at Elongation indicates a correction of 1° 15′ 29.9″ for latitude 40°. (Latitude 48° correction was 1° 26′ 26.1″). When his attention was called to this, the witness admitted that according to that authority his angles would be at least 1° 14′ in error. Carried the full 74.60 chains across this fractional section that error would result in a falling of the line of 106 feet from the correct position. From the west quarter corner Vernon retraced to the center of the section and then went to the south quarter corner. There he found a rock conforming to the government notes, but said it was out of place about twenty feet south and 14.4 feet east from a tamarack tree which he, by checking the witnesses, determined to be the corner. From there he ran a random by compass to the north quarter corner, arriving on the line 111½ feet to the east of the corner monument. From this he computed that he had crossed the east-west center line, 56.4 feet east of the center of the section. He then projected his east-west center line east to the meander line.

From the points and lines thus determined he located plaintiffs' property lines approximately in the locations claimed by the defendants. He did not go to either of the section corners and admitted that he did not follow the directions of the manual in running the east-west center line. Manual § 206. Asked if he observed any other purported location in the area where he found the west quarter corner, he said there was a stake driven in the ground 45 feet west from the government monument. A survey based upon that point as a corner, using the same bearing for the center line, obviously could not affect the boundaries in question.

One, Chester C. Ellicott, a surveyor called by the defense, was on the ground in October, 1952, and made a check of the Vernon survey. He visited the north, west and south quarter corners, but did not go to either of the section corners. He testified Vernon's survey coincided very closely with the government field notes. Ellicott did not run the lines and used a transit only at the south quarter corner to check bearings. His other observations were made by compass. He acknowledged that, according to the manual of instructions, the east-west center line should have been run from the west to the meander line on the lake on a mean of the bearings of the north and south section lines, and that neither Vernon nor he so ran that line. He also testified that the rock which he and Vernon accept-

ed as the west quarter corner, was not the monument described in the government field notes.

From this résumé, it is apparent that the Modlin survey was the only one made in a comprehensive, accurate manner in compliance with the manual of instructions issued by the government. The surveys by Vernon and Ellicott were not tied to or checked against section corners or section lines and were only partially complete. This does not comply with manual sections 203 and 204. Vernon agreed with Modlin that Ashley's courses and distances through the northeast quarter do not reach the meander line of the lake.

In such a state of the record, the trial court was bound to accept the lines as located by Modlin. Richardson v. Bohney, 19 Idaho 369, 114 P. 42; Johnson v. Dunn, 46 Idaho 25, 266 P. 1099, certiorari denied, 278 U.S. 567, 49 S.Ct. 79, 73 L.Ed. 510; State v. Vanderkoppel, 45 Wyo. 432, 19 P.2d 955. The plaintiff had overwhelmingly carried the burden of proof, and there is an absence of substantial evidence to support the findings of the court in favor of the defendants. Claunch v. Jones, 75 Idaho 271, 270 P.2d 1002.

In 1941, a house was built, partly on lot 1 of Garfield Bay Add. No. 1 and partly on land immediately to the north. An addition was built on this house in 1950. According to the Modlin survey all of this building is on plaintiffs' land. In 1947, one Borquist commenced building a house on lot 1, Garfield Bay Add. No. 2. This house is on land owned by defendants before they sold the lot to Borquist. However, the western portion of the lots sold to Borquist is on plaintiffs' land. The court found that plaintiffs observed the building of these structures and made no protest or objection. If it were intended by such finding to bind the plaintiffs to the boundaries claimed by defendants, on the theory of acquiescence, the record is entirely insufficient to support such finding or conclusion. The plaintiffs during the time involved were residents of Montana and visited the lands involved only infrequently. They did not know that the house on Add. No. 1 was being built upon their land or that Garfield Bay Add. No. 2 was being laid out in part upon their land, and as early as 1946 expressed to defendants a desire to have a comprehensive survey made to establish the lines. Defendants would not, or at least did not, agree to a joint survey. Plaintiff Cramer acknowledges that defendant pointed out to him the corners of tract B. in 1946. From the corners thus pointed out, it would appear that the house was south of the center line and properly located on defendants' land. It was at that time and again in 1950, when plaintiffs expressed a desire to have a survey made. There is nothing in this testimony to indicate plaintiffs' acquiescence in the lines claimed by

84

defendants. Bayhouse v. Urquides, 17 Idaho 286, 105 P. 1066; Kesler v. Ellis, 47 Idaho 740 and 746, 278 P. 366 and 368; Beneficial Life Ins. Co. v. Wakamatsu, 75 Idaho 232, 270 P.2d 830; State v. Vanderkoppel, 45 Wyo. 432, 19 P.2d 955; Copley v. Eade, 81 Cal.App.2d 592, 184 P.2d 698.

■ However, the record does not indicate defendants acted in bad faith in claiming the boundaries which they now seek to establish. Tiggelbeck's warning that their claimed line was too far north should have prompted a survey by them, but would not be sufficient to require the conclusion that they knowingly sought to claim land belonging to plaintiffs. They built the house purporting to be on lot 1, of Add. No. 1, apparently believing the site belonged to them. Accordingly, they should be given a reasonable time to remove that house from plaintiffs' property. Richardson v. Bohney, 19 Idaho 369, 114 P. 42.

The judgment is reversed and the cause is remanded to the district court with directions to fix the boundary lines on the ground in accordance with the Modlin survey and where established by him; and to allow respondents ninety days in which to remove the house from appellants' property.

Costs to appellants.

KEETON, PORTER, ANDERSON and SMITH, JJ., concur.